**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY HALCHAK, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **3:18-CV-1285** |
| | : | **(JUDGE MARIANI)** |
| **DORRANCE TOWNSHIP BOARD OF** | : | |
| **SUPERVISORS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OPINION**</u>

**I. INTRODUCTION**

Presently before the Court are three cross-motions for summary judgment. Defendants Dorrance Township Board of Supervisors (the "Dorrance Board") and Alan Snelson (Doc. 64) (together, "Dorrance Defendants"), and Code Inspections, Inc. ("CII") and Ken Fenstermacher (Doc. 71) (together, "CII Defendants"), move for summary judgment on all claims against them. Plaintiffs Anthony and Kelly Halchak move for summary judgment on their procedural due process claims against the Dorrance Board, CII, and Fenstermacher (Doc. 66).

Plaintiffs filed their original Complaint on November 18, 2015, (Doc. 1-1), but the operative complaint is the Amended Complaint, an action in mandamus filed in the Court of Common Pleas of Luzerne County on December 7, 2017. (Doc. 2-1). Dorrance Defendants removed the action to this Court on June 26, 2018, with CII's and Fenstermacher's consent.

(Doc. 1 ¶ 9.) Although the Amended Complaint contains five counts, the Court of Common Pleas denied Plaintiffs' Petition for Leave to File an Amended Complaint as to Counts II and III. (Doc. 2 ¶ 3 & n.1.) Counts I, IV, and V remain. Count I does not identify a specific cause of action, but alleges that Defendants acted "in violation of the Plaintiffs [sic] procedural due process rights and civil rights under federal and state law" and demands judgment directing that Defendants "issue an Occupancy Permit" and awarding damages, costs and attorney's fees. (Doc. 2-1 at ¶ 52–54, 56.) The federal due process claims provide the basis for federal jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over the mandamus relief is proper under 28 U.S.C. § 1367. Counts IV and V are claims for "damages" against Defendants.

For the reasons set forth herein, Defendants' Motions are granted in their entirety, and Plaintiffs' Motion is denied in its entirety.

## II. STATEMENT OF FACTS

This case reflects Plaintiffs' efforts to obtain two permits, a zoning permit and an occupancy permit,[1] both needed to commence the lawful operation of a used car lot on their property. The briefs reflect strong disagreement between the parties as to whether and how each of the permits need to be obtained, due to underlying disputes regarding the past use

---

[1] The parties refer to the second permit as both an "occupancy permit" and a "certificate of occupancy." The Court understands the terms to be interchangeable, and will refer to the permit as an "occupancy permit."

of the property and the parties' interpretations of the relevant zoning and building code provisions. However, the Record itself demonstrates no dispute as to the material facts.

The following facts are undisputed, unless otherwise noted.

### A. History of Property

On November 13, 2009, Plaintiffs purchased two adjoining parcels of land in Dorrance Township, Luzerne County, Pennsylvania from John and Maria Colon. (Plaintiffs' Concise Statement of Material Facts, Doc. 67 at ¶ 1; *see generally* 686 South Mountain Blvd. Deed, Doc. 65-1). Plaintiffs intended to operate a used car lot on the property. (Doc. 67 at ¶ 2.)

The Amended Complaint and "documents associated with the transfer of the property" identify the property's address as 686 South Mountain Boulevard. (Dorrance Defendants' Statement of Material Facts, Doc. 65 at ¶¶ 9–10; *see, e.g.*, 686 South Mountain Blvd. Deed, Doc. 65-1 at 8.) Plaintiffs aver that the mailing address of the whole property was 686 South Mountain Boulevard when they purchased it, but that the two parcels acquired separate mailing addresses—686 and 688 South Mountain Boulevard—"[s]ometime in 2010." (Plaintiffs' Counterstatement of Material Facts in Response to Statement by CII Defendants, Doc. 83 at ¶ 5.)

The property with a current mailing address of 686 South Mountain Boulevard has a single-family house and pool. (Doc. 65 at ¶ 12; A. Halchak 6/23/2020 Dep. Tr., Doc. 65-5, Ex.

E at 98:3–98:6).[2] The adjoining parcel is the subject of this litigation (the "Property") and currently has a mailing address of 688 South Mountain Boulevard. (Doc. 65 at ¶¶ 11, 13; Aerial Photograph, Doc. 65-7, Ex. G at 2).[3] The Property has a "one-door garage and an attached room with a separate entrance," both of which existed when Plaintiffs purchased the Property. (Doc. 65 at ¶ 14, Doc. 65-5, Ex. E at 97:18–98:2).

The Property is located in a zoning district designated as a "B-2 Highway Business District" under the Zoning Ordinance for Dorrance Township enacted January 8, 2007. (Doc. 67 at ¶ 3; Doc. 67-1, Ex. 2.)

The parties agree on the following history of the ownership of the Property, though the extent to which these details were known to the parties when the relevant events occurred is

---

[2] Plaintiffs deny this statement, alleging that "[a]t all times relevant to this matter the property known as 686 South Mountain Boulevard consisted of a garage and office." (Doc. 79-1 at ¶ 12).  However, Mr. Halchak's testimony directly contradicts Plaintiffs' denial:

Q. And when I say the property, let's be specific.  688 South Mountain Boulevard?
A. That's correct.
          MS. DOUGHERTY: Objection.
BY MR. CROTTY:
          Q. Well, that's – when I'm talking about property right now, that's what we're talking about.  Right?
A. Yes, 688, yes, where the garage and the office is at.
Q. Okay.  So do you recognize that – it's your position that 686 is a separate and distinct parcel of ground?
A. Yes. It's a house.

(A. Halchak 6/23/2020 Dep. Tr. at 97:18–98:6).

[3] Plaintiffs deny this statement. However, their denial relates solely to the description of the 686 South Mountain Boulevard property as "residential," (Doc. 79-3 at ¶ 11), as they argue that "at all times during the dealings between the Halchaks and Snelson, the mailing address [of the Property] was 686 South Mountain Boulevard." (*Id.* at 13–14.)

4

not clear. Anna and Joseph Kamionka bought the Property on December 12, 1978, and sold it to Fairway Consumer Discount Company on March 29, 1999. (Doc. 65-1, Ex. A at 38, Kamionka Deed; *id.* at 34, Fairway Deed.)[4] Fairway Consumer Discount Company sold the Property to Andrey and Yelena Makarenko on November 1, 1999. (*Id.* at 32, Makarenko Deed.) The Makarenkos sold the Property to John and Marie Colon on May 1, 2009. (*Id.* at 30, Colon Deed.)

From 1999 until 2009, the Record reflects no evidence of the operation of an automotive sales business on the Property, but Plaintiffs allege (without evidence) that the Colons "had placed cars on the property for sale."[5] (Doc. 65 at ¶ 17; Doc. 79-3 at ¶ 17.) Nonetheless, Plaintiffs acknowledge that the Property was vacant, and did not contain an

---

[4] The Kamionkas held two vehicle salesperson licenses that expired in 1974 and 1976. (Doc. 65 at ¶ 25; Anna Kamionka License, Doc. 65-11, Ex. K at 2; Joseph Kamionka License, Doc. 65-12, Ex. L at 2.)

[5] Defendants aver that the Property was vacant from 1999 through 2009 and was "not used for an auto sales use business" during that time.  (Doc. 65 at ¶ 17). Plaintiffs dispute this because they understood that the Colons had "placed cars on the property for sale." (Plaintiffs' Counterstatement of Facts, Doc. 79-3 at ¶ 17.) Defendants aver that "Plaintiffs have no evidence of the Colons' use of the property, other than understanding that it was vacant." (Doc. 65 at ¶ 16; Doc. 65-4, Ex. D at 187; Doc. 65-5, Ex. E at 102–03.) Plaintiffs respond that they "understood the property had been previously used for the operation of a used car sales business, had no other use, and at the time the Colons owned it, they had placed vehicles on the property for sale." (Doc. 79-3 at ¶ 16.) In his deposition, Mr. Halchak stated, "I don't know if it was formal, but [Mr. Colon] did have a few cars there that he would sell now and then," but clarified that he did not purchase a business from the Colons. (A. Halchak 3/13/2020 Dep. Tr., Doc. 79-5, Ex. 2 at 15:16–25.) Mrs. Halchak explained that they "were told there was an existing used car lot there in the past" but acknowledged that no business of the sort was existing at the time that Plaintiffs purchased the property from the Colons. (K. Halchak 8/19/2020 Dep. Tr., Doc. 79-6, Ex. 3 at 104:19–105:4.)

Because Plaintiffs present no evidence of the Colons' use of the Property, and because their testimony makes clear that there was no existing business on the Property when Plaintiffs purchased it, and that they did not purchase a business from the Colons, the Court finds it undisputed that no automotive sales business operated on the Property from 1999 through 2009.

automotive sales business, when they purchased it. (A. Halchak 3/13/20 Dep. Tr. at 98:13–16.)

Plaintiffs had no dealings with the Makarenkos, Fairway Consumer Discount Company, or the Kamionkas, and obtained from them no records of the use to which these previous owners put the Property. (Doc. 65 at ¶¶ 21–23.) Although Mr. Colon allegedly told Mr. Halchak that "there was a car lot" on the Property, Mr. Colon "didn't specify whether it was a licensed car dealership." (Doc. 79-5, Ex. 2 at 30:4–13.)

### B. Governing Zoning Provisions

The Dorrance Township Zoning Ordinance provides that "[n]o building, structure or sign shall be erected, constructed, moved, added to or structurally altered, nor shall any land, structure or building be put to any use without first obtaining a zoning permit from the Zoning Officer." Dorrance, Pa., Zoning Ordinance § 1302.1 (Jan. 8, 2007). A certificate of zoning compliance is also required "prior to the occupation for the use or change of use of any building, structure or land." *Id.* § 1303. "Change of use" is defined as "[a]ny use which differs from the previous use of a building, structure, or land." *Id.* § 201.

Furthermore, the Dorrance Township Subdivision and Land Development Ordinance enacted on September 28, 2006 [SALDO], requires that

> [n]o subdivision or land development of any lot, tract, or parcel of land shall be made, and no street, sanitary sewer, water main, gas, oil, or electric transmission line, or other facilities in connection therewith shall be laid out, constructed, opened, or dedicated for public use or travel or for the common use of occupants of buildings abutting thereon, except in accordance with the provisions of this Ordinance.

SALDO § 103.1. Further,

> [n]o lot in a proposed subdivision or land development may be sold, and no
> zoning and/or building permit to erect any building, structure or other
> improvements upon land in a subdivision or land development may be issued
> unless and until . . . [t]he plans and application have been granted final
> approval by the Township Board of Supervisors.

*Id.* § 103.2. SALDO defines "Land Development" as, *inter alia*, "[t]he improvement of

one lot or two (2) or more contiguous lots, tracts or parcels of land for any purpose involving

. . . a single nonresidential building on a lot or lots regardless of the number of occupants or

tenure." *Id.* at § 202.

Under the Pennsylvania scheme for zoning matters, the zoning hearing board has

jurisdiction to hear and render final adjudications in matters which include a zoning officer's

"failure to act" on an application for any permit. 53 P.S. § 10909.1(a)(3).

### C. 2009 Zoning Permit Application

In November 2009, Plaintiffs contacted the Dorrance Board seeking a permit for a

used car dealership. (Doc. 65 at ¶ 27.) The Dorrance Board directed Plaintiffs to Zoning

Officer Alan Snelson. (*Id.*) In their initial dealings with the Dorrance Board and Snelson,

Plaintiffs referred to the Property for which they sought a zoning permit as 686 South Mountain

Boulevard. (*Id.* at ¶ 28.) On November 17, 2009, Snelson emailed Ms. Halchak regarding

Plaintiffs' request:

> Kelly attached is an application for a Land Development and a zoning permit at
> 686 S Mountain Blvd. as well as the fee structure.

The location is a B-2 zoning district.  The intent is the development of a used car lot.

To my knowledge there is not an existing structure on the property.
Also, to my knowledge there is not an existing septic system or well on the property.

Therefore you'll need to obtain approval for the project at the Planning commission prior to applying for a Zoning PErmit [sic]

Should you have any questions regarding this matter feel free to contact me [sic]

(Doc. 65-13, Ex. M at 2). Ms. Halchak replied:

We received your letter and zoning application, thank you, just want to clarify one point, your letter mentioned there was no structure, there is an existing structure on the property.  There was a previous business there at some point,there [sic] is a garage and attached room with a separate entrance.
Thanks again for the forms,If [sic] I have any further questions I will call or email you.

(Doc. 65 at ¶ 32; Doc. 65-9, Ex. I at 2).

On November 24, Snelson replied to Ms. Halchak: "Thanks for the info on the building. That may change things for you as it relates to the Land Development Application, since the building and property may have had this activity approved in the past." (Doc. 65 at ¶ 34; Doc. 65-15, Ex. O at 4). He added, "I will visit the site as well as search the files and let you know what my findings are." (*Id.*) Snelson testified that he subsequently visited the Property[6] and

---

[6] Defendants point out that Plaintiffs referred to the Property as "686 S. Mountain Blvd." in their initial dealings with Dorrance Defendants. (Doc. 65 at ¶ 33.) However, they have not suggested that Snelson visited the wrong property.

searched through his files, which are kept alphabetically in a filing cabinet in the Dorrance Township office. (A. Snelson 3/12/2020 Dep. Tr., Doc. 65-16, Ex. P at 22:16–24; 27:12–19; 50:1–24.)[7] His search did not recover any records approving either 686 or 688 South Mountain Boulevard for this "activity" in the past. (*Id.* at 57:2–18.)

Plaintiffs had informed Snelson that the Colons and the Makarenkos were previous owners of the property,[8] but they did not provide him with any records or other information regarding prior land development approvals associated with 686 or 688 South Mountain Boulevard. (*Id.* at 57:11–58:6; A. Halchak 3/13/2020 Dep. Tr., Doc. 65-10, Ex. J at 80:8–81:22.)[9]

---

[7] Plaintiffs "admit that Snelson testified he searched the records," but they "questioned whether Snelson ever made any search of the municipal records for the zoning permits." (Doc. 79-3 at ¶ 35). Because Snelson testified he searched the records and Plaintiffs have produced no evidence to dispute as much, the Court deems this statement admitted.

[8] The Record does not clearly demonstrate whether Plaintiffs also informed Snelson of the Kamionkas. Ms. Halchak first testified that she "[did not] remember if we mentioned [Kamionka's] name at that time . . . In the early meetings we had with Mr. Snelson before we were issued the zoning permits, I don't remember if we gave him the name of the used car lot." (Doc. 79-5, Ex. 3, K. Halchak 8/19/20 Dep. Tr. at 105:18–106:4.) In the same deposition she testified that she "believe[s]" that Mr. Halchak "had given [Mr. Snelson] the name of the former owners of the property and that's when the name Kamionka was first mentioned." (*Id.* at 106:11–17.) Snelson testified only that Plaintiffs told him about the Colons and the Makarenkos in 2009. (A. Snelson 3/12/2020 Dep. Tr. at 57:2–58:6.)

While Plaintiffs do not argue in their briefs that Snelson was or should have been aware of the name "Kamionka" prior to 2014, the Court finds there is a dispute as to whether Plaintiffs told Snelson about the prior owners with that surname during their interactions in 2009 and 2010.

[9] Plaintiffs deny Dorrance Defendants' statement that "Plaintiffs were afforded the opportunity to submit additional documentation as to prior uses and did not." (Doc. 65 at ¶ 40; Doc. 79-3 at ¶ 40). Plaintiffs argue that they "provided only the information known and available to them. Prior zoning records were the property of the Defendant, Dorrance, and maintained by Dorrance and not subject to public inspection." (Doc. 79-3 at ¶ 40). This explanation, however, does not deny that Plaintiffs had the chance to submit additional information, but did not do so. Accordingly, the Court deems Plaintiffs' denial nonresponsive to Dorrance Defendants' statement and, therefore, deems this statement admitted.

Plaintiffs submitted a Zoning Permit Application on December 20, 2009. (2009 Zoning Permit Application, Doc. 65-18, Ex. R at 2–4.) Plaintiffs indicated on the form that the application was for "[r]oof, siding, replace 3 windows 2 doors," and they identified the proposed use as "used car sales." (*Id.* at 3). On December 21, Snelson emailed Plaintiffs:

> I've tried to reach you regarding the zoning permit application you submitted for the proposed car lot.
>
> The improvements to the building are not structural nor do they increase the size of the building. As such, no permit for that is needed; however, you do need a zoning permit for the use of the property as a used car lot. Before I can issue a zoning permit for use of the property, I need to see the Approved Land Development Plan for the site.
>
> I've looked through all the files here in Dorrance Township and find no record of it.  I believe if there is one, it would have been issued to either John Colon or the previous owner or owners named Mackarenko [sic].  If you have any records that support the fact that Land Development approval has been granted for this property, please get the information to me.
>
> Otherwise, before any further action can be taken on the "Land Development" of this property as a used car lot you will need to submit an application for Plan approval. That application was sent to you via email on 11/17/09 via email. I'm sending it with this message once again.

(12/21/2001 Email, Doc. 65-17, Ex. Q at 2.) Plaintiffs provided no records or information in response. (A. Halchak 3/13/20 Dep. Tr. at 80:8–81:22.)

At some point in November or December, Snelson told Plaintiffs they would need to install a bathroom on the Property in order to obtain an occupancy permit. (A. Halchak 3/13/20 Dep. Tr. at 93:16–94:13.)

Snelson and Plaintiffs attended a Township Planning Commission meeting on December 28, at which Mr. Halchak expressed that he planned to open a used car dealership on the Property with roughly twenty cars for sale. (12/28/2009 Twp. Planning Comm'n Meeting Minutes, Doc. 65-19, Ex. S at 2.) Snelson explained that because "he could find nothing in the files of the township of anything proposed in the past," Plaintiffs' proposed use "is starting at square 1" and Plaintiffs "would have to comply with all sorts of plan approvals." (*Id.*) The "sewage issue" was also discussed again. (*Id.* at 94:21–95:9; Doc. 65-19, Ex. S at 2.)

The day after the meeting, Snelson sent an email to Plaintiffs summarizing their discussion, outlining the steps Plaintiffs must take to secure the necessary permits and approvals, and providing relevant contact information. (A. Snelson 12/29/2009 Email, Doc. 65-20, Ex. T at 2.) In particular, Snelson explained, "[s]ince the facility is a commercial establishment, you will be required to comply with the building code requirements of Dorrance Township. For specifics contact Code Enforcement [sic] Inc. @ 868.8482." (*Id.*) Plaintiffs did not contact CII at that point.[10] (K. Halchak 8/19/2020 Dep. Tr. at 91:3–24.)

---

[10] Plaintiffs "admit[] and den[y]" that they "did not contact CII as directed in Snelson's December 29, 2009 email." (Doc. 65 at ¶ 58; Doc. 79-3 at ¶ 58.) Plaintiffs explain, "The Halchaks did not contact CII because they did not accept that there were any requirements to undertake a construction permit as they intended to use the existing building without change." (Doc. 79-3 at ¶ 58.) Because Dorrance Defendants' state only that Plaintiffs did not contact CII and do not provide a reason for Plaintiffs' inaction, Plaintiffs' denial is nonresponsive to Dorrance Defendants' statement. Accordingly, the Court deems this statement admitted.

On January 19, 2010, Plaintiffs met with Snelson again. (K. Halchak 1/19/2010 Meeting Notes, Doc. 65-21, Ex. U at 2.) Snelson reiterated the need to submit a Land Development Application. Ms. Halchak's notes from the meeting state, "Land Development Application (change of use) required every time there is a change of use of business because change of use changes business related things such as parking etc." (*Id.*) Snelson also showed Plaintiffs the Dorrance Township Zoning Ordinance section pertaining to "Change of Use." (*Id.*) Ms. Halchak wrote, "Although there is no state requirement for us to have a bathroom as a used automobile sales lot, Dorrance [Township] is requiring it due to the fact . . . we are changing the use, which now means we have to comply with all the new codes." (*Id.*)

That same day, Snelson returned the fee Plaintiffs had submitted with their Zoning Permit Application. (A. Snelson 3/12/20 Dep. Tr. at 52:20–53:17.) Snelson testified he did this because Mr. Halchak had "applied for a permit to put roof, siding, and replace the windows for a used car lot," and these actions did not require a permit. (*See id.*)

The parties agree that Plaintiffs did not submit any additional applications or materials to Snelson or the Dorrance Board with regard to the Property between December 20, 2009, and January 2014. (Doc. 65 at ¶ 64; Doc. 79-3 at ¶ 64.) Dorrance Board had a duly constituted Zoning Hearing Board in 2009, but Plaintiffs did not appeal Snelson's actions—or lack thereof—with respect to their application. (Doc. 65 at ¶¶ 65, 67; Doc. 79-3 at ¶¶ 65, 67.)

### D. 2014 Zoning Permit Application

In January 2014, Snelson saw Mr. Halchak at a meeting and realized that "this had been sitting for a while." (A. Snelson 3/12/20 Dep. Tr. at 75:23–25.) He raised the issue to his colleagues, and Dorrance Township Secretary/Treasurer Patricia Davis told him that she recalled someone by the name of Kamionka operating a car lot on the Property decades earlier. (*Id.* at 75:23–76:16.) Davis, who was hired after Plaintiffs contacted Snelson in 2009, subsequently located documents related to the Kamionkas' use of the Property in a filing cabinet in a storage room within the Dorrance Township office.[11] (*Id.* at 76:17–19; P. Davis 3/12/20 Dep. Tr. at 35:18–36:1.)

The Kamionka permits that Davis located do not demonstrate that the Kamionkas operated a used car lot on the Property; while one of the permits is for "reopening garage business," none of them reference used car sales. Joseph Kamionka applied for two permits (Nos. 90 and 91) in 1978, for the construction of a "double wide modular and accessory garage" at RD #9, Box 188, Mt. Township." (Doc. 65 at ¶ 71; Doc. 65-14, Ex. N at 4.) Plaintiffs aver that this was the address assigned to the Property at the time. (Doc. 79-3 at ¶ 75.) In 1985, Kamionka applied for two more permits (Nos. 326 and 327) under the name "Kamionka's Garage," at the same address. (Doc. 65 at ¶ 73; Doc. 65-14, Ex. N at 5–15.) Permit No. 326 was for "reopening garage business." (Doc. 65-14, Ex. N at 6.) Permit No.

---

[11] The parties dispute whether this filing cabinet was maintained separately from other zoning matters. (Doc. 65 at ¶ 79; Doc. 79-3 at ¶ 79.)

327 was for the installation of a mobile home/garage, and the permit states "occupancy after sewage system is installed." (*Id.* at 10.)[12]

Snelson instructed Plaintiffs to submit another Zoning Permit Application (without a Land Development application) following this discovery. (Doc. 65 at ¶ 80.) Plaintiffs submitted a Zoning Permit Application seeking a permit to operate a used car dealership on January 27, 2014. (Doc. 65 at ¶ 81; 2014 Zoning Permit Application, Doc. 65-24, Ex. X.)

On January 29, Snelson issued Plaintiffs (1) "a Certificate of Non-conformity certifying that the lot and existing building on the [Property] were lawfully nonconforming with respect to lot size and building setback"; (2) "a Certificate of Zoning Compliance certifying that automotive sales were permitted on the [Property]"; and (3) a Zoning Permit for the operation of an "Automotive Sales business (non residential use of an existing structure) in accordance with Section 506.1 B of the Dorrance Township Ordinance of 2007." (Doc. 65 at ¶¶ 82–84; Zoning Certificate, Doc. 65-25, Ex. Y at 2–4.)

Plaintiffs subsequently inquired about obtaining an occupancy permit, and Snelson told Plaintiffs that he did not issue occupancy permits. (Doc. 65 at ¶¶ 85–86; A. Halchak 3/13/20 Dep. Tr. at 141:5–17.) He directed Plaintiffs again to CII, the third-party agency appointed by the Dorrance Board to administer and enforce its Uniform Construction Code,

---

[12] Dorrance Defendants and Plaintiffs agree that Permit No. 327 and its reference to a sewage system "related to the Kamionka's residential parcel adjoining the [Property]" and not to the Property itself. (Doc. 65 at ¶ 78; Doc. 79-3 at ¶ 76–78.) CII Defendants, however, do not admit that Permit No. 327 is unrelated to the Property. (*See* Doc. 72 at ¶¶ 30, 31.)

and specifically to a CII employee named Ken Fenstermacher. (A. Halchak 3/13/20 Dep. Tr. at 141:5–25; Doc. 65-26, Ex. Z at 2; Record of Dorrance Township Board of Commissioners meeting minutes for August 2, 2004, Doc. 65-1, Ex. 12.) The parties agree that Plaintiffs sought nothing further from Snelson after this point. (Doc. 65 at ¶ 87; Doc. 79-3 at ¶¶ 80–87.)

### E. Regulations Governing Occupancy Permits

Pursuant to the Pennsylvania Construction Code Act ("PCCA"), the Pennsylvania Department of Labor and Industry has promulgated construction standards and regulations known as the Uniform Construction Code ("UCC"). *See* 35 P.S. § 7210.102(a). The UCC governs the "construction, alteration, repair and occupancy of all buildings." *Id.* § 7210.104(a). The Dorrance Board adopted the PCCA by Ordinance passed on June 7, 2004. Dorrance, Pa., Ordinance 6-7-04-1 (June 7, 2004). In July 2004, the Dorrance Board appointed CII to administer and enforce the UCC on its behalf. (Doc. 65-31, Ex. EE at 7.) CII remained the sole UCC administrator and enforcement officer for Dorrance Township until June 2018. (Doc. 65-30, Ex. DD.)

Under the UCC, "[a] building, structure or facility may not be used or occupied without a certificate of occupancy issued by a building code official." 34 Pa. Code § 403.46(a). In Plaintiffs' case, an occupancy permit is required if the Property was an "uncertified building," defined as "an existing building which was not approved for use and occupancy by the Department or a municipality which was enforcing a building code before April 9, 2004." 34 Pa. Code § 401.1. The UCC provides further that an uncertified building must "meet[] the

requirements of the latest version of the 'International Existing Building Code . . .' or Chapter 34 of the 'International Building Code . . . ,'" whichever "best applies, in the official's professional judgment." 34 Pa. Code § 403.28(c)(1).

Together, the International Existing Building Code of 2009 ("IEBC") and the International Building Code of 2009 ("IBC") impose construction standards and requirements on buildings "not previously occupied or used for its intended purpose in accordance with the laws in existence at the time of its completion." IEBC § 101.4.[13] An occupancy permit "shall

---

[13] In their briefs, the parties cite the 2009 versions of the IBC and IEBC without explanation, but the Court's research suggests the 2009 codes were the "latest versions" adopted in Pennsylvania at the time of the events at issue.

The IBEC "appl[ies] to the repair, alteration, change of occupancy, addition and relocation of all existing buildings, regardless of occupancy," IEBC § 101.4, and provides that

A building or portion of a building that has not been previously occupied or used for its intended purpose in accordance with the laws in existence at the time of its completion shall comply with the provisions of the International Building Code . . . for new construction or with any current permit for such occupancy.

IEBC § 101.4.1. In contrast, with respect to "buildings previously occupied":

The legal occupancy of any building existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, . . . or as is deemed necessary by the code official for the general safety and welfare of the occupants and the public.

IEBC § 101.4.2. The IBC requires that

[a]lterations, repairs, additions and changes of occupancy to existing structures . . . comply with the provisions for alterations, repairs, additions and changes of occupancy in the . . . International Plumbing Code [and various other codes].

IBC § 3401.3. Furthermore,

[n]o change shall be made in the use or occupancy of any building that would place the building in a different division of the same group of occupancies or in a different group of

be issued" only once the requirements for the new occupancy classification, determined by the intended purpose of the building, are met. *See* IBC § 3408.2.

Under the IBC, the "use of a building or structure, or a portion thereof, for office, professional or service-type transactions, including storage of records and accounts," is categorized as a "Business Group B" occupancy. IBC § 304.1. "Business Group B" covers, among other types of businesses, "motor vehicle showrooms." *Id.* To meet the requirements for the issuance of an occupancy permit under the IBC, Business Group B structures must have a bathroom with a toilet and a sink. IBC §§ 2901.1, 2902.1; *see infra* note 37.

Before undertaking the construction that may be required to comply with the aforementioned code provisions, the UCC provides that

> one who seeks to construct or enlarge a commercial building "shall first apply to the building code official and obtain the required permit under § 403.42a." The application *must be presented in the approved format, which, inter alia, requires construction documents prepared by a licensed architect or licensed professional engineer*, showing the location, nature and extent of the work proposed and how the project conforms to the Uniform Construction Code[.] 34 Pa. Code § 403.42a(a), (b),(c) and (e).

*Flanders v. Ford City Borough Council*, 986 A.2d 964, 970 (Pa. Commw. Ct. 2009) (emphasis added) (internal citation omitted). 34 Pa. Code § 403.42 provides, in pertinent part,

> (a) A building code official *shall grant or deny a permit application*, in whole or in part, within 30 business days of the filing date. Reasons for the denial must

---

occupancies, unless such building is made to comply with the requirements of this code for such division or group of occupancies,

IBC § 3408.1, and an occupancy permit shall be issued only once "it has been determined that the requirements for the new occupancy classification has been met." IBC § 3408.2.

be in writing, identifying the elements of the application which are not in compliance with the relevant provisions of the Uniform Construction Code and ordinance as appropriate and providing a citation to the relevant provisions of the Uniform Construction Code and ordinance as appropriate, and sent to the applicant. . . .

(b) A building code official *shall examine the construction documents* and shall determine whether the construction indicated and described is in accordance with the Uniform Construction Code and other pertinent laws or ordinances as part of the application process.

34 Pa. Code § 403.43. In addition,

[a] municipality which has adopted an ordinance for the administration and enforcement of the Uniform Construction Code or is a party to an agreement for the joint administration and enforcement of the Uniform Construction Code *shall establish and appoint members to serve on a board of appeals* under section 501(c) of the act (35 P. S. § 7210.501(c)).

34 Pa. Code § 403.121(a) (emphasis added). Section 403.122(a) provides that "[a]n owner or owner's agent may seek a variance or extension of time or appeal a building code official's decision by filing a petition with the building code official or other person designated by the board of appeals on a form provided by the municipality."

### F. 2014: Occupancy Permit Application

Sometime in February 2014, Plaintiffs contacted Fenstermacher and asked him for "an application for an occupancy permit." (A. Halchak 3/13/20 Dep. Tr. at 142:4–14.) Fenstermacher provided Plaintiffs with a "Construction Permit Application." (Doc. 72 at ¶¶ 21– 22; Doc. 65-27, Ex. AA at 2–3.) Plaintiffs contend this was "not the correct form for submission to reopen a business in an existing building without change or modification," though they did not communicate this to Fenstermacher at the time. (Plaintiffs' Counterstatement of Material

Facts in Response to CII and Fenstermacher Defendants' Facts, Doc. 83-2 at ¶ 21; A. Halchak 3/13/20 Dep. Tr. at 171:4–23.)

Plaintiffs submitted a Construction Permit Application to CII on February 18, 2014. (Doc. 67 at ¶ 19; Doc. 72 at ¶ 21.) They did not attach any construction documents to their application. (*See* Doc. 72 at ¶ 40.) On the application form, Plaintiffs selected "Other" for the "Type of Work or Improvement" and described the proposed work as "Occupancy Permit." (Ex. AA at 2.) Ms. Halchak's name does not appear on the form. (*See id.*)

On March 18, 2014, Fenstermacher advised Plaintiffs that in order to obtain an occupancy permit, they would have to install accessible bathroom facilities, (Doc. 65 at ¶ 91; A. Halchak 3/13/20 Dep. Tr. at 159:2–11; K. Fenstermacher 3/10/20 Dep. Tr. at 72:8–24, 133:11–16), and their application would have to include professional design drawings for those facilities.[14] (A. Halchak 3/13/20 Dep. Tr. at 160:1–9.)

On March 25, Fenstermacher met with Ms. Halchak about the application. (K. Fenstermacher 3/10/20 Dep. Tr. at 134:7–11.) He reiterated the need for bathroom facilities. (*Id.* at 134:13–15.) Ms. Halchak showed Fenstermacher Kamionka Permit No. 327, approved under the name "Kamionka's Garage," and argued that it proved their proposed use had had been approved in the past and therefore Plaintiffs should not have to install bathrooms. (*Id.*

[14] The Court notes that this was not the first time Plaintiffs were told they needed professional design drawings. (*See* K. Halchak 1/19/2010 Meeting Notes, Doc. 65-21, Ex. U at 2 ("According to Mr. Frank Tirico, Code Enforcement Officer, we need to hire a licensed architect to draw up the plans required for a building permit pertaining to accessibility.").)

19

at 134:9–15.) Fenstermacher "pointed out that one of the requirements for this was plainly stated on [Permit No. 327] that well and septic were required."[15] (*Id.* at 134:13–15.)

Thereafter, Plaintiffs consulted an architect about drafting the required construction documents for the bathroom, and the architect estimated it would cost $9,200 to produce them. (A. Halchak 3/13/20 Dep. Tr. at 161:19–162:16.) Mr. Halchak then asked Fenstermacher if Plaintiffs could produce the drawings themselves. (*Id.* at 165:10–12.) When Fenstermacher said no, Mr. Halchak told him, "I'm done with this, I had enough[] . . . I'll get a lawyer involved." (*Id.* at 166:6–8.) Mr. Halchak testified that Fenstermacher "flew off the handle" during this exchange, "slammed his hands on his desk," and "came at [him.]" (*Id.* at 166:1–8.) Plaintiffs had no further contact with Fenstermacher after this, and never substantially interacted with anyone else at CII. (Doc. 65 at ¶¶ 97–98; A. Halchak 3/13/20 Dep. Tr. at 179:3–13.)

Plaintiffs understood at this time that CII required them to submit drawings prepared by a licensed professional and to install bathroom facilities in order to obtain an occupancy permit.[16] (A. Halchak 3/13/20 Dep. Tr. at 181:13–182:19.)

---

[15] Plaintiffs now argue that Permit No. 327 has "no application to the [Property]." (Doc. 83-2 at ¶ 31.) Because CII Defendants dispute the application of Permits 326 and 327 to each of the two parcels (686 and 688 South Mountain Boulevard), the Court finds the assignment of each permit to each parcel is disputed.

[16] Mr. Halchak's testimony is unclear as to whether he understood at the time that because Plaintiffs had not met these requirements, Fenstermacher *would not be issuing* an occupancy permit. Mr. Halchak testified as follows:

On December 11, 2014, Fenstermacher wrote in his files associated with Plaintiffs' application: "Nothing to issue at this point. No further advance on getting approved sewer permits to install a restroom in building." (3/10/20 K. Fenstermacher Dep. Tr. at 136:1–3.) Almost a year later, on November 12, 2015, Fenstermacher made another note: "Close out as nothing further has taken place." (*Id.* at 136:6–10.)

As of the filing of the present Motions, Plaintiffs have not filed a new application with the required drawings, (A. Halchak 6/23/20 Dep. Tr. at 46:1–7), and the Property does not have sewage or bathroom facilities. (K. Halchak 8/18/20 Dep. Tr. at 90:13–15.) Plaintiffs never received an occupancy permit, (Doc. 65 at ¶ 107), nor any written grant or denial of their application. (Doc. 78 at 10; Doc. 79 at 8.)

On March 3, 2017, Dorrance Township established a UCC Board of Appeals. (*See* Doc. 65-29, Ex. CC.)

---

> *Q.* I understand. So your understanding was Mr. Fenstermacher was telling you you had to have a drawing by a licensed architect and then plans to install a bathroom, sink and a toilet, and actually install the sink and toilet in order to obtain an occupancy permit, is that right?
> . . .
> *A.* At that point—yeah. That's what my understanding with [sic] was, yes.

(A. Halchak 3/13/20 Dep. Tr. at 182:11–19.)

> *Q.* I'm just trying to confirm you knew you were not going to get an occupancy permit from Mr. Fenstermacher or Dorrance Township at the time?
> *A.* I don't know what their thoughts were. I didn't know. If I went home and one was there, that would be great for me. I didn't know what their plans were after that.

(*Id.* at 183:16–22.)

21

On June 11, 2018, Dorrance Township ended its contract with CII. (*See* Doc. 65-30, Ex. DD.)

### III. STANDARD OF REVIEW

#### A. Summary Judgment

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited to not establish the absence or presence of a genuine dispute, or than an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed.2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable juror could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

23

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion."[17] *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310). "If upon review of cross motions for summary judgment [the court] find[s] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145–46 (3d Cir. 1998)).

---

[17] *Beenick* further explains,

> [the plaintiff] argues that the District Court failed to apply the correct standard on cross-motions for summary judgment because it did not fully consider his motion for partial summary judgment. Beenick is correct that a District Court should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The District Court did not violate this rule because it did not consider the cross-motions simultaneously. Rather, it addressed Defendants' motion for summary judgment first. By proceeding with Defendants' motion first, the District Court viewed the evidence in the light most favorable to Beenick and concluded that Defendants were entitled to summary judgment on all of his claims. That conclusion ended the case and mooted any need to consider Beenick's cross-motion for partial summary judgment.

*Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

## IV. ANALYSIS

### A.  Protected Property Interest in Zoning and Occupancy Permits

First, the Court addresses a threshold issue, critical to Plaintiffs' constitutional claims against both Dorrance and CII Defendants: whether Plaintiffs have a protected property interest. Though not styled as such, Plaintiffs bring their due process claims under 42 U.S.C. § 1983.[18] "Section 1983 does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law." *Spradlin v. Borough of Danville*, No. 4:CV 02 2237, 2005 WL 3320788, at *2 (M.D. Pa. Dec. 7, 2005) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995)). Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege that "(1) . . . the conduct complained of was committed by a person acting under color of state law and (2) . . .

---

[18] At the outset, it difficult to discern whether Plaintiffs assert these claims against Snelson, CII, and Fenstermacher in their individual or official capacities. To the extent they are sued in their official capacities, those claims are dismissed as duplicative of Plaintiffs' claims against the local government entity—the Dorrance Township Board of Supervisors—itself. *See Palmer v. City of Scranton*, No. CV 3:17-2369, 2018 WL 3207323, at *2 (M.D. Pa. June 29, 2018). Despite the absence of a clear indication that Plaintiffs intended to sue them as individuals, the Court will construe the suit as seeking relief against these officers in their individual capacities as well. *See Banks v. Gallagher*, No. 3:08-CV-1110, 2011 WL 718632, at *7 (M.D. Pa. Feb. 22, 2011) (first citing Fed. R. Civ. P. 8(e); then citing *Hindes v. FDIC*, 137 F.3d 148, 157 (3d Cir. 1998); and then citing *Biggs v. Meadows*, 66 F.3d 56, 60–61 (4th Cir. 1995)) (looking to the "nature of the plaintiff's claims, the relief sought, and the course of proceedings" and construing claims as against officers in their individual capacities despite "confusion" as to the capacity in which they were sued).

[that] the conduct deprived the complainant of rights secured under the Constitution or federal law." *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1988). None of the Defendants has argued it is not "a person acting under color of state law," so the second element is the sole focus of this Court's analysis.

The Supreme Court has explained the distinction between substantive and procedural due process as follows:

> We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, *see, e.g., Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S. Ct. 1983, 1995, 32 L. Ed. 2d 556 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, *see, e.g., Daniels v. Williams*, 474 U.S. [327,] 331, 106 S. Ct. [662,] 664[, 88 L. Ed. 2d 662 (1986)] (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised].

*Cnty. of Sacramento v. Lewis*, 523 U.S. 845-46, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998).

A plaintiff cannot prevail on a substantive or procedural due process claim without showing he has been deprived of a property interest that the Constitution protects. *See Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1290 (3d Cir. 1993). "[T]he property interests protected by substantive due process are narrower than the interests protected by procedural due process"—"[o]nly those . . . interests that are 'fundamental' under the . . . Constitution are worthy of substantive due process protection." *Fortune Dev., L.P. v. Bern Twp.*, No. CIV.A. 12-2327, 2013 WL 990454, at *6 (E.D. Pa. Mar. 13, 2013) (first citing *DeBlasio v. Zoning Bd.*

*of Adjustment for Twp. of W. Amwell*, 53 F.3d 592, 601 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003); and then citing *Gikas v. Washington Sch. Dist.*, 328 F.3d 731, 736 (3d Cir. 2003)).

Plaintiffs correctly state that "possessory interests in property invoke procedural due process protections." *Long v. Bristol Twp.*, No. CIV.A. 10-1069, 2012 WL 2864410, at *5 (E.D. Pa. July 11, 2012) (quoting *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998)). But whether a yet-to-be-issued permit is a protected property interest, under either procedural or substantive due process law, is less clear.

With respect to procedural due process, the Third Circuit has explained,

> Core to the existence of an individual property interest is the requirement that the plaintiff have "a legitimate claim of entitlement to" the interest at issue that stems from "an independent source such as state law" or "rules or understandings that secure certain benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, it is not sufficient that a plaintiff has an "abstract need or desire" or a "unilateral expectation" of a particular benefit. *Id.*

*McKinney v. Univ. of Pittsburgh*, 915 F.3d 956, 960 (3d Cir. 2019). Some cases indicate that plaintiffs must establish "entitlement" *to zoning and occupancy permits themselves*, not merely to the use of their land, before they can properly invoke constitutional protections on these grounds. *See, e.g., WVCH Commc'ns, Inc. v. Kalil*, No. CIV. A. 93-CV-2225, 1993 WL 268903, at *2 (E.D. Pa. July 15, 1993), *aff'd sub nom. WVCH Commc'ns, Inc. v. Upper Providence Twp.*, 27 F.3d 561 (3d Cir. 1994) (holding that plaintiffs could not establish a

protected property interest "unless and until it is proven that they are entitled to the zoning variance which they sought").

But with respect to substantive due process, the Third Circuit has held that "ownership [of land] is a property interest worthy of substantive due process protection," and has foregone analysis of a potential interest in the permit itself. *See DeBlasio*, 53 F.3d at 600–01. The Third Circuit explained,

> [I]in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a landowning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached.

*Id*. This suggests the "use and enjoyment of property" itself is a sufficient property interest on which to base a due process challenge to a permit approval process, and that a plaintiff need not show entitlement to the actual permit.

In *Flanders v. Dzugan*, the Western District of Pennsylvania recognized both of these concepts. The court held that while the plaintiff had a protected property interest in the "ownership of real property" and "in the premises wherein he conducted his business," he did not have a property interest in obtaining a building permit. 156 F. Supp. 3d 648, 665 (W.D. Pa. 2016). Because he had not been issued a building permit, "the permit itself cannot serve as the 'property interest' of which [the plaintiff] was deprived." *Id.* (citing *Flanders v. Ford City Borough*, 986 A.2d 964, 966 (Pa. Commw. Ct. 2009)). Still, the Court did not dispose of his claim on these grounds, apparently holding that his interest in the land itself was sufficient to

maintain a substantive due process claim based on the failure to issue a building permit. *See id.* at 666.

For purposes of deciding the present Motions, this Court reaches the same conclusion as the court in *Flanders*.[19] Plaintiffs have not demonstrated a "legitimate claim of entitlement" to an occupancy permit,[20] but the Court will assume that Plaintiffs' interest in the land itself is sufficient to maintain both substantive and procedural due process claims.

### B. Dorrance Defendants' Motion for Summary Judgment

Dorrance Defendants move for summary judgment on all claims against them. (Doc. 66 at ¶ 1.) Plaintiffs did not clearly delineate causes of action in their Amended Complaint, but Plaintiffs clarify in their Brief in Opposition that they are not pursuing a *procedural* due process claim against Snelson. (Doc. 79 at 11.) Accordingly, the claims at issue are (1) substantive due process claims against both Dorrance Defendants, (2) a procedural due process claim against the Dorrance Board, and (3) mandamus claims against both Dorrance Defendants.[21]

---

[19] Defendants have not challenged whether Plaintiffs have protected property interests, but as necessary elements of Plaintiffs' claims, this Court's *sua sponte* analysis is appropriate.

[20] The Court will not question Plaintiffs' "legitimate claim of entitlement" to their zoning permit, as it has already been issued. But they are not "entitle[d]" to an occupancy permit because none has been issued and Plaintiffs have not demonstrated satisfaction of the requirements for permit issuance under the UCC (*e.g.*, Plaintiffs have not submitted construction documents as required by 34 Pa. Code § 403.42a).

[21] The Court notes that although Dorrance Defendants asserted an affirmative defense of qualified immunity in their Answer, (Doc. 44 at 10), none of the Defendants has raised or briefed said defense at the motion for summary judgment stage. Because of this, and because the Court holds that Plaintiffs have failed to establish any constitutional deprivations as a matter of law, the Court does not reach the question of qualified immunity.

### 1. Substantive Due Process

Plaintiffs broadly contend that all Defendants violated their substantive due process rights.[22] A claim for a violation of one's substantive due process rights may lie when a government official engages in "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Lewis*, 523 U.S. at 840. "[A] plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chaney v. Street*, 523 F.3d 200, 219 (3d Cir. 2008); *see also Blain v. Twp. of Radnor*, 167 F. App'x 330, 333 (3d Cir. 2006) ("In land-use cases, only executive action that 'shocks the conscience' constitutes a substantive due process violation." (citations omitted)). "The 'shocks the conscience' standard encompasses 'only the most

---

[22] Plaintiffs allege in their Amended Complaint,

Defendants have continued to engage in a continuing course an [sic] unlawful, intentional, willful, vexatious and discriminatory course of conduct designed to prevent the Plaintiffs from opening their automotive sales and service business by failing to acknowledge and recognize the existence of the structure present on the property previously used for automotive sales and service with a lawful Zoning Certificate issued as early as 1978, wrongfully mandating a Subdivision and Land Use Application, and failing to acknowledge existing zoning certificates, charging unnecessary fees prior to accepting an application for an Occupancy Permit, using a third party agency construction code official without a contract who assigned an individual who was not certified to issue a permit for plaintiff's property and then surreptitiously compelling plaintiffs to complete a construction permit application, instead of the correct Occupancy Permit Application so that it would be used to compel compliance with all building codes.

(Doc. 2-1 at ¶ 44.)

egregious official conduct.'" *United Artists Theatre Circuit, Inc.*, 316 F.3d at 400 (quoting *Lewis*, 523 U.S. at 846).

Plaintiffs' claim against Dorrance Defendants falls short when judged against the "shocks the conscience" standard. Zoning and other land-use decisions are typically "matters of local concern" that "should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *United Artists Theatre Circuit*, 316 F.3d at 402. In these cases, the "shocks the conscience" standard prevents federal courts "from being cast in the role of a 'zoning board of appeals.'" *Id.* (quoting *Creative Env'ts Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)). "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999). Nonetheless, in general terms, the Supreme Court has "repeatedly emphasized that only the *most egregious* conduct can be said to be 'arbitrary in the constitutional sense'" and therefore qualify as conscience-shocking. *Lewis*, 523 U.S. at 846 (quoting *Colling v. Harker Heights*, 503 U.S. 115, 129 (1992)).

In an earlier case involving Snelson himself, the Third Circuit explained, "In the land-use context, we look for evidence of corruption, self-dealing, intentional interference with constitutionally protected activity, virtual 'takings,' or bias against an ethnic group on the part of local officials." *Button v. Snelson*, 679 F. App'x 150, 154 (3d Cir. 2017) (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004)).

31

Upon review of the Record,[23] we find no evidence upon which a reasonable jury could find that Dorrance Defendants' conduct qualifies as the "most egregious." Rather, this case presents the hallmarks of an admittedly contentious zoning dispute that should be resolved at the local, not federal level.

As an initial matter, Plaintiffs have failed to produce evidence of any actions taken by the Dorrance Board in relation to their permit applications. In fact, Plaintiffs fail to discuss the Dorrance Board in the section of their Brief in Opposition dedicated to substantive due process, and they do not refute Dorrance Defendants' claim that Plaintiffs failed to establish any evidence of the Board's "involvement, disapproval, communications or otherwise with respect to Plaintiffs' proposed used auto sales business." (*See* Doc. 74 at 17; Doc. 79 at 10–11). Accordingly, the Court will grant Dorrance Defendants' Motion for Summary Judgment as to Plaintiffs' substantive due process claim against the Dorrance Board.

Plaintiffs also assert a substantive due process claim against Snelson, but fail to demonstrate that his conduct "shocks the conscience."

Dorrance Defendants contend that Snelson's "actions with respect to Plaintiffs' efforts to obtain zoning approval were fair and reasonable." (Doc. 74 at 13.) They argue,

> The record establishes that, in late 2009 and early 2010, he fielded Plaintiffs' requests; advised them of his interpretation; directed them to the process under the Zoning Ordinance he believed warranted; advised them of other approvals

---

[23] The Court notes that none of the parties has submitted full deposition transcripts, so the Record does not include all testimony that has been given.

needed; and allowed them an opportunity to provide him with information or documentation to modify his interpretation."

(*Id.* at 11.)

In response, Plaintiffs argue that "Snelson has an established history of disregard for the rights of the business owners in Dorrance and Dorrance was on notice of his conduct" and contend that Snelson's conduct was "deliberate" and "establishes a course of action that has no reasonable relation to legitimate government objectives." (Doc. 79 at 10–11.) According to Plaintiffs,

> Snelson's activities as Zoning Officer in denying the obvious existence of the structure on the property, continuing insistence upon compliance with SALDO, even after agreeing that an existing structure did not require such compliance, imposing a burden on the Halchaks to produce documentation unavailable to them, otherwise readily available to him, and his complete and intentional disregard for his obligation to search records under his control constitute evidence of a violation of the Halchaks['] substantive due process.

(*Id.*)  Notably, Plaintiffs cite nothing in the record to support these claims. (*See id.*)

Even if supported, Plaintiffs' conclusory assertions are devoid of any allegations of "corruption, self-dealing, intentional interference with constitutionally protected activity, virtual 'takings,' or bias against an ethnic group." *Button*, 679 F. App'x at 154 (quoting *Eichenlaub*, 385 F.3d at 286). Accordingly, as in *Button v. Snelson*, Snelson's conduct reflects, at worst, "merely negligent . . . performance of official duties" and "does not shock the conscience."[24]

---

[24] In fact, the Third Circuit described Snelson's conduct as "merely negligent *or sometimes contentious performance* of official duties." *Button*, 679 F. App'x at 154. Nothing here supports a "contentious" characterization.

Plaintiffs contend first that Snelson's "[denial of] the obvious existence of the structure on the property" violated their substantive due process rights. (Doc. 79 at 10–11). This is not so. The Record demonstrates that Snelson's "den[ial]" was actually a mistake that was quickly corrected, (3/12/2020 A. Snelson Dep. Tr. at 47:20–22; 49:22–50:19), and the contention that such a mistake "shocks the conscience" demonstrates a misunderstanding of the substantive due process standard.

Plaintiffs also argue that Snelson violated their rights by "continuing [to insist] upon compliance with SALDO, even after agreeing that an existing structure did not require such compliance." (Doc. 79 at 11.) But the Record shows that once Snelson located the Kamionkas' permits and learned of the Kamionkas' use of the Property, he no longer required the submission of a Land Development Application.[25] (*See* Doc. 67 at 9–10.) This conduct does not shock the conscience.

Further, despite having limited and sometimes inconsistent information, Snelson still acted diligently to locate the necessary records. The Record reflects that Plaintiffs gave Snelson different addresses for the Property without explanation and provided no documents or records regarding the Property's previous uses. And contrary to Plaintiffs' assertion that Snelson "complete[ly] and intentional[ly] disregarded . . . his obligation to search records

---

[25] The Record also indicates that Snelson did not "agree[]" as much. Rather, Snelson acknowledged in his deposition that "[i]f there was no *change in use* for an existing structure, [that would] eliminate the need for a land development application." (3/12/2020 A. Snelson Dep. Tr. at 48:15–19 (emphasis added).)

under his control," the evidence indicates Snelson searched his files and determined neither the Colons nor the Makarenkos had been approved for car sales in the past. (3/12/2020 A. Snelson Dep. Tr. at 57:2–18.)[26] When Snelson repeatedly asked Plaintiffs to provide him with any relevant records, Plaintiffs produced nothing. *Id.*[27]

In sum, while the Court expresses no view as to whether Snelson correctly applied SALDO or the Zoning Ordinance,[28] the Court determines that there is no dispute of material fact that Snelson's application and enforcement of those laws with respect to Plaintiffs did not "shock the conscience." The Record reflects no evidence creating a genuine issue of material fact as to the absence of corruption or self-dealing. Rather, Snelson's conduct falls under the category of "examples of the kind of disagreement that is frequent in [zoning and] planning disputes." *Eichenlaub*, 385 F.3d at 286. The undisputed facts reflect conduct that does not give rise to a constitutional violation as a matter of law, and the Court will grant the Dorrance

---

[26] Plaintiffs "admit that Snelson testified he searched the records," but they "questioned whether Snelson ever made any search of the municipal records for the zoning permits." (Doc. 79-3 at ¶ 35). Because Snelson testified that he searched the records and Plaintiffs have produced no evidence to dispute this, the Court deems this fact undisputed.

[27] The Court notes that whether the Kamionka permits were "readily available" to Snelson is disputed but immaterial regardless. The Record does not clearly demonstrate whether Plaintiffs mentioned the name "Kamionka" in early conversations with Snelson about prior owners of the Property. *See supra* note 8. But the parties agree that the zoning records were organized alphabetically by owner. (A. Snelson 3/12/2020 Dep. Tr., at 27:12–19.). Drawing inferences in the light most favorable to Plaintiffs, the Court finds that at worst, Snelson had a conversation with Mr. Halchak about prior owners in 2009, during which Mr. Halchak "mentioned" the Kamionkas, and therefore Snelson acted negligently in failing to locate the Kamionka permits before 2014. (See 8/19/20 K. Halchak Dep. Tr. at 106:11–17.) However, because "mere[] negligen[ce]" does not "shock the conscience," this disputed fact is not material to the disposition of the claim.

[28] That would be a question for the Zoning Hearing Board on appeal. *See* 53 P.S. § 10909.1(a)(3).

Defendants' Motion with respect to the substantive due process claim against Snelson, and enter judgment in Snelson's favor.

### 2. Procedural Due Process

Plaintiffs also allege that the Dorrance Board violated their procedural due process rights by failing to establish a board of appeals to which Plaintiffs could appeal CII's decisions, as required by the UCC. *See* 35 P.S. § 7210.501(c). Procedural due process requires that individuals receive "the opportunity to be heard at a meaningful time and in a meaningful manner" when they are impacted by government action. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976).

> In order to make out a claim for a violation of procedural due process, a plaintiff must allege three elements: (1) that the defendant was acting under color of state law; (2) that the defendant deprived him of a property interest; and (3) the state procedures for challenging the deprivation did not satisfy the requirements of procedural due process. *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 680 (3d Cir. 1991) (overruled on other grounds by *United Artists Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392 (2003); *see also*, *Parratt v. Taylor*, 451 U.S. 527, 536-37 (1981). When a state "affords a full judicial mechanism with which to challenge the administrative decision" at issue, it provides adequate procedural due process, irrespective of whether the plaintiffs avail themselves of that process. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 597 (3d Cir. 1995) (overruled on other grounds by *United Artists*, 316 F.3d 392; *see also, Midnight Sessions*, 945 F.2d at 681 ("The availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly decided, preclude[s] a determination that the decision was made pursuant to a constitutionally defective procedure.").

*Sutton v. Chanceford Twp.*, No. 1:14-CV-1584, 2016 WL 7231702, at *10 (M.D. Pa. Dec. 14, 2016), *aff'd*, 763 F. App'x 1186 (3d Cir 2019).

With respect to the third element, federal courts have frequently determined that in the context of municipal land use decisions, Pennsylvania law provides administrative and legal remedies that satisfy procedural due process. *See Sixth Angel Shepherd Rescue Inc. v. West*, 790 F. Supp. 2d 339, 358 (E.D. Pa. 2011), *aff'd*, 477 F. App'x 903 (3d Cir. 2012) (citing *Perano v. Twp. of Tilden*, 423 F. App'x 234, 237 (3d Cir. 2011)) ("Pennsylvania's scheme for judicial review of administrative land use decisions has . . . passed constitutional muster.") Therefore, courts have held that "[b]ecause Pennsylvania's state procedure for challenging an administrative zoning decision satisfies procedural due process, plaintiff fails to state a claim founded on a violation of procedural due process." *Nicolette v. Caruso*, 315 F. Supp. 2d 710, 721 (W.D. Pa. 2003).

Further, when state law provides a remedy,

a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982); *see also*, *Bohn v. County of Dakota*, 772 F.2d 1433, 1441 (8th Cir. 1985). A due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. *See McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995); *Dwyer v. Regan*, 777 F.2d 825, 834–35 (2d Cir. 1985), *modified on other grounds*, 793 F.2d 457 (2d Cir. 1986); *Riggins v. Board of Regents*, 790 F.2d 707, 711–12 (8th Cir. 1986).

*Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

Accordingly, federal courts frequently reject procedural due process claims made by plaintiffs who have not fully availed themselves of potential remedies under state law. *See*, *e.g.*, *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d 670, 692 (E.D. Pa. 2017), *aff'd*, 726 F. App'x 118 (3d Cir. 2018); *Sixth Angel Shepherd Rescue Inc.*, 790 F. Supp. 2d at 358. And when the record shows that judicial remedies were available to the plaintiffs under state law, and the plaintiffs actually availed themselves of those remedies by pursuing state court litigation, a federal procedural due process claim typically fails as a matter of law. *See, e.g., Sixth Angel Shepherd Rescue Inc.*, 790 F. Supp. 2d at 358 (denying procedural due process claim when the plaintiff "is currently pursuing its appeal of the . . . Zoning Hearing Board's decision through Pennsylvania's court system").

Plaintiffs argue that the Dorrance Board violated their procedural due process rights by failing to establish a board to which they could appeal a code administrator's decision under the UCC. (Doc. 79 at 13); *see* 34 Pa. Code § 403.121. The Court does not reach this question because it finds that Plaintiffs did not submit a building permit application in accordance with the requirements of the UCC, and accordingly did not receive an appealable decision on their application.[29] Without a decision from CII to appeal, whether Plaintiffs could have or should have "taken advantage of the processes that [were] available" to them if they *had* submitted a complete application and *had* received a decision to appeal, and whether

---

[29] *See* discussion *infra* at 45.

any procedures were in fact available or adequate, *see Alvin*, 227 F.3d at 115, are hypothetical questions not appropriate for this Court's consideration. Put differently, Plaintiffs do not have standing to allege a constitutional deprivation on this basis because they have "yet to suffer any harm" with respect to the alleged lack of a board of appeals, and "allegations of 'possible future injury' are not sufficient to satisfy Article III." *Glen Riddle Station, L.P. v. Middletown Twp.*, No. CV 21-286, 2021 WL 1141964, at *4 (E.D. Pa. Mar. 25, 2021). Accordingly, Plaintiffs have not established a valid procedural due process claim against the Dorrance Board.[30]

The Court will grant Dorrance Defendants' Motion with respect to Plaintiffs' procedural due process claim against the Dorrance Board and deny Plaintiffs' Motion with respect to the Dorrance Board, and enter judgment in Dorrance Defendants' favor.

### 3. Mandamus Relief

---

[30] The Court notes further that Plaintiffs have not established municipal liability. Dorrance Township cannot be held liable for the acts of its employees under *respondeat superior* or vicarious liability. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). To determine any possible municipal liability, the Court looks to whether Plaintiffs have "demonstrate[d] that the violation of rights was caused by the municipality's policy or custom." *Johnson v. City of Philadelphia*, 975 F.3d 394, 403 (3d Cir. 2020) (quoting *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014)). Plaintiffs can show as much by demonstrating that a supervisor "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)). On the Record, the Court finds that the Dorrance Board's conduct here shows no constitutional deprivation by way of an established policy, custom, or practice, nor have Plaintiffs shown the Board has participated in, directed, or had "knowledge of [or] acquiesced in" any due process violations caused by its subordinates. Therefore, Plaintiffs cannot establish municipal liability.

Lastly, Plaintiffs demand "judgment against Defendants directing that they issue an Occupancy Permit." (Doc. 2-1 at 14.) Dorrance Defendants have demonstrated they are entitled to summary judgment with respect to Plaintiffs' mandamus action. Under Pennsylvania law,

> Mandamus is an extraordinary remedy designed to compel the performance of a ministerial act or a mandatory duty. *Evans v. Pennsylvania* [*Bd. of Prob.*] *and Parole*, 820 A.2d 904 (Pa. [Commw. Ct.] 2003), *appeal quashed*, 580 Pa. 550, 862 A.2d 583 (2004); *Bell Atlantic Mobile* [*Syss.*]*, Inc.* [*v. Borough of Clifton Heights*, 661 A.2d 909, 911 (Pa. [Commw. Ct.] 1995), *appeal denied*, 544 Pa. 652, 676 A.2d 1194 (1996)]. Mandamus may only be granted where there is a clear legal right in the plaintiff, a corresponding duty in the defendant, and a lack of any other appropriate and adequate remedy. *Bell Atlantic Mobile* [*Syss.*]*, Inc.*[, 661 A.2d at 911]*; M & W* [*Corp.*] *v. Upper Chichester* [*Twp.*], 651 A.2d 630[, 632] (Pa. [Commw. Ct.] 1994). The purpose of mandamus is not to establish legal rights but only to enforce those legal rights that have already been established.

*Orange Stones Co. v. City of Reading, Zoning Hearing Bd.*, 32 A.3d 287, 290 (Pa. Commw. Ct. 2011).

This cause of action fails for a host of reasons. First, it is not clear this Court even has "the authority to grant the relief [Plaintiffs] seek[]." *Glen Riddle Station, L.P.*, 2021 WL 1141964, at *7. Federal courts have declined, on *Erie* doctrine grounds, to "issue a state law mandamus prescribing how a state or local agency must interpret and enforce its own regulations." *Id.* at *5–7.[31]  Second, even if this Court had such authority, mandamus is proper

---

[31] As the Eastern District of Pennsylvania explained, because a "state court issues [a] mandamus order as a procedural remedy pursuant to common law," mandamus relief is not properly granted by federal courts. *Glen Riddle Station, L.P.*, 2021 WL 1141964, at *6; *see also* 52 Am. Jur. 2d Mandamus § 7 (explaining that mandamus will not issue "from a federal court to a state . . . or its officers").

only "[w]hen the legal right to the issuance of a building permit is clear." *Kirk v. Smay*, 367 A.2d 760, 762 (Pa. Commw. Ct. 1976). "The right to a building permit is not clear, however, where the applicant has not met all of the necessary requirements of a[n] . . . ordinance." *Id.* Plaintiffs have not demonstrated satisfaction of the requirements for permit issuance under the UCC; to name one deficiency, they have not submitted construction documents as required by 34 Pa. Code § 403.42a. The Dorrance Board's issuance of a permit under such circumstances would be neither a "ministerial act" nor a "mandatory duty."

Therefore, the Court will grant Dorrance Defendants' Motion with respect to mandamus relief, and will accordingly grant the Motion in its entirety.

### B. CII Defendants' Motion for Summary Judgment[32]

CII Defendants also move for summary judgment on all claims against them. The Court will incorporate the law and analysis stated *supra* by reference as relevant.

### 1. Substantive Due Process

In their Brief in Opposition to CII Defendants' Motion, Plaintiffs make various conclusory statements, unsupported by even a single citation to the Record, alleging that Fenstermacher violated their substantive due process rights:

> The Halchaks contend that Fenstermacher acted intentionally to forestall the Halchaks from securing their occupancy permit. Fenstermacher, acting in concert with the Defendants, Dorrance and Snelson, continued in a course of

---

[32] As an initial matter, CII Defendants' argument that they are immune under the Pennsylvania Political Subdivision Tort Claims Act is without merit, as the Act does not provide government officers with immunity from liability on *federal claims*. *See Phillips v. Heydt*, 197 F. Supp. 2d 207, 222 (E.D. Pa. 2002) (citing 42 P.S. §§ 8541, *et seq.*). Because Plaintiffs assert federal due process claims against CII Defendants, they are not immune from liability under this statute.

conduct that is arguably evidence of corruption and self-dealing. He shared an office space with Snelson and was well aware of the ongoing adverse treatment received by the Halchaks from Snelson. He disregarded each and every responsibility to carry out his duties as the third-party agency for Dorrance for the administration and enforcement of the PACC. Although acknowledging his legal responsibilities to undertake an inspection, he intentionally misapplied prior permit records. He never issued a grant of denial, even throughout the time this matter has been in litigation and he remained code enforcement official for Dorrance Township through sometime in 2018.

(Doc. 83 at 16–17.) Having already established that substantive due process rights protect against only the "most egregious official conduct," *see supra* at 30–31, the Court easily concludes that Plaintiffs' allegations are all either facially devoid of conduct that shocks the conscience (*e.g.,* the claim that Fenstermacher "never issued a grant or denial"), or unsupported by the Record (*e.g.,* the claim that he "continued in a course of conduct that is arguably evidence of corruption and self-dealing"). The Record reflects that Fenstermacher advised Plaintiffs in accordance with his interpretation of the UCC and presents no evidence showing a triable dispute of material fact as to "corruption, self-dealing, intentional interference with constitutionally protected activity, virtual 'takings,' or bias against an ethnic group." *Button*, 679 F. Appx at 154 (quoting *Eichenlaub*, 385 F.3d at 286). As with Plaintiffs' substantive due process claim against Snelson, their dispute with Fenstermacher reflects "matters of local concern" that "should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *United Artists Theatre Circuit*, 316 F.3d at 402.

The Court will grant CII Defendants' Motion with respect to Plaintiffs' substantive due process claim.

### 2. Procedural Due Process

Plaintiffs also contend that CII Defendants violated their procedural due process rights by "fail[ing] to act on the Halchaks application" for an occupancy permit. (Doc. 77 at 14.) Plaintiffs argue,

> Although the federal courts have generally recognized that the scheme of appeals in Pennsylvania is constitutional, all of the decisions rest upon the existence of a decision by the administrative agency. In the Halchaks case, there has never been a decision to trigger an appeal. The absence of the decision effectively blocks the Halchaks from protecting their procedural due process rights. The non existence [sic] of a decision distinguishes the Halchaks [sic] case from the opinions which recognize that Pennsylvania has a constitutional scheme in place for review. In essence, there was nothing for the Halchaks to appeal and no basis upon which any review could be considered. The Halchaks have never been afforded a basis to pursue an appeal.
>
> Further, the failure to act on the Halchaks [sic] application is in direct violation of the procedural protections established within the PACC.

(*Id.*) Indeed, this Court previously denied Dorrance and CII Defendants' Motions to Dismiss, rejecting a Report and Recommendation, (Doc. 35, "R&R"), and holding that Plaintiffs had alleged a proper procedural due process claim in part because the pleadings demonstrated that they had not received an appealable decision on their permit application. *See Halchak v. Dorrance Twp. Bd. of Supervisors*, No. 3:18-CV-1285, 2019 WL 4795650, at *5 (M.D. Pa. Sept. 30, 2019). This Court found it was "undisputed that Plaintiffs' application for an occupancy permit was never granted or denied." *Id.* That fact distinguished this case from

those relied upon in the R&R because "in cases involving land-use decisions, a property owner does not have a ripe, constitutional claim until the zoning authorities have had 'an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question.'" *Id.* (quoting *Sameric,* 142 F.3d at 597).

While the parties agree that Plaintiffs' permit application was never granted or denied, (Doc. 78 at 10; Doc. 79 at 8), CII Defendants present several arguments in defense.[33]   First, CII Defendants contend that Plaintiffs "cannot establish a procedural due process violation where judicial relief was available." (CII Defendants' Brief in Support, Doc. 78, at 20.) This argument has merit. Courts have held that a petition for a writ of mandamus is "a vehicle to challenge inaction on the part of municipal authorities," including inaction in the form of "delay from evaluation to the issuance of a permit," and in cases where such relief is available, procedural due process claims fail. *LXR RS V, LLC v. Municipality of Norristown*, No. 2:19-CV-01397-JDW, 2019 WL 4930157, at *5 (E.D. Pa. Oct. 7, 2019); *accord Mader v. Union Twp.*, No. 2:20-CV-01138-CCW, 2022 WL 395052, at *7 (W.D. Pa. Feb. 9, 2022). As such,

---

[33] The Court acknowledges CII Defendants' argument that Ms. Halchak's name is not listed on the Construction Permit Application form, only Mr. Halchak's, and therefore Ms. Halchak cannot state a claim with respect to this application. However, the Court finds this detail insignificant as Ms. Halchak's name appears on previous applications related to the Property. Moreover, Fenstermacher had conversations with both Plaintiffs with respect to this application and does not appear to suggest that Ms. Halchak is unassociated with the Property or the proposed business. This argument is therefore rejected.

the availability (and actual pursuit) of mandamus relief in state court defeats Plaintiffs' procedural due process claim.[34]

Even if mandamus relief did not preclude a procedural due process claim, CII Defendants contend that Plaintiffs "did not complete the permit application according to the UCC requirements and [are] not entitled to relief from [their] incomplete application." (*Id.* at 9.)[35] In other words, they argue Plaintiffs were not owed a grant or denial of their application, nor any subsequent remedial procedures, because they never submitted a complete application in the first place. Because it is clear that a permit application was required to be submitted with professionally-drawn construction documents and could not properly be considered without those documents, the Court agrees.

As the court in *Flanders v. Ford City Borough Council* explained, a building permit "application must be presented in the approved format, which, *inter alia,* requires construction documents prepared by a licensed architect or licensed professional engineer, showing the location, nature and extent of the work proposed and how the project conforms to the Uniform Construction Code[.]" 986 A.2d 964, 970 (Pa. Commw. Ct. 2009) (citing 34 Pa. Code § 403.42a(a), (b),(c) and (e)).

---

[34] That Plaintiffs have not demonstrated a "clear legal right" to an occupancy permit in the present litigation, *see supra* at 41, is immaterial. What matters is that Plaintiffs had a state judicial remedy available to them.

[35] CII Defendants also contend they *did* act on Plaintiffs' permit application "when they informed Mr. Halchak his application required construction documents prepared by a licensed professional," and that action was appealable. (Doc. 78 at 10.) The Court does not reach this argument because it finds that Plaintiffs' incomplete application does not entitle them to a decision or any other appealable action.

Plaintiffs were repeatedly informed that their "application required construction documents prepared by a licensed professional," but they declined to submit said documents. Plaintiffs argue 34 Pa. Code § 403.42a does not apply to their permit application, and therefore their permit application does not require construction documents, because these provisions only govern applications to "construct, . . . alter, . . . or change the occupancy of a commercial building, structure and facility," none of which Plaintiffs intend to do. (Plaintiffs' Reply to CII Defendants' Brief in Opposition to their Motion, Doc. 89 at 8.) Plaintiffs contend they "simply want to open a used car sales business in an existing structure without any change or modification." (*Id.*) Plaintiffs explain, "The subject property and structure were approved for used car sales by Dorrance since at least 1978. There is no evidence of any other use of the property. The Halchaks contend this represents a continuous approved use." (*Id.* at 10.) In other words, Plaintiffs apparently suggest that the Property has been "continuous[ly]" used as a used car dealership, so opening a car dealership would not constitute a "change of use," and therefore CII and Fenstermacher were wrong to require them to comply with the applicable building codes (*i.e.*, to install a bathroom), and as such, they properly submitted their occupancy permit application without professional construction documents.

But Plaintiffs provide no evidence to substantiate this series of conclusions, and the law is clear with respect to (1) the need for an occupancy permit, and (2) the requirements that must be met before an occupancy permit can be issued, including the submission of

professional construction documents. Notwithstanding Plaintiffs' adamant assertions to the contrary, the record evidence is undisputed that Plaintiffs' proposed use would involve a change of occupancy.

The IBC defines "change of occupancy" as a "change in the purpose or level of activity within a building that involves a change in application of the requirements of this code." IBC § 202. While Plaintiffs have represented otherwise in their Briefs,[36] Mr. Halchak testified unequivocally that "there wasn't a business operating on the property" when Plaintiffs purchased it in November 2009, and that Plaintiffs planned to "operate a business on the property." (3/13/20 A. Halchak Dep. Tr. at 128:10–25.) It follows that Plaintiffs were proposing to change "purpose or level of activity" within the structure on the Property from vacant, or at least not operating a business, to operating a business.

Plaintiffs argue that the Property should be treated as a "building previously occupied" under the IEBC, and their proposed use should not trigger any construction requirements, because of the Kamionkas' past use. *See* IEBC § 101.4.2 ("The legal occupancy of any building existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, . . . or as is deemed necessary by the

---

[36] For example, Plaintiffs contend without support, "[T]he evidence in this case establishes the structure was fully certified and in use for used car sales since at least 1978 with all approvals required to conduct business in the subject property," (Doc. 89 at 8); and, "There is no evidence of any other use of the property. The Halchaks contend this represents a continuous approved use," (*id.* at 10); and, "The record clearly establishes the prior use of the structure since at least 1978 as an office and garage for the sale of used cars." (Doc. 83 at 9.)

code official for the general safety and welfare of the occupants and the public.") The Court disagrees. First, this provision provides for "legal occupancy . . . to *continue* without change." *Id.* (emphasis added). If the current use of the Property were permitted to *continue* in this case, it would *continue* to be vacant.

Even if the past use did not have to be continuous—put differently, if the fact that the Property was long ago used for a similar purpose was sufficient, and it did not matter that the past two owners of the Property have not operated any vehicle-related business on the Property—Plaintiffs have failed to produce an occupancy permit indicating the Property was ever approved to be a used car dealership. The most Plaintiffs have produced is a 1985 "Building/Development Permit Application" in which the Kamionkas sought to "reopen[] a] garage business." (*See* Doc. 65-14, Ex. N, at 6.) Plaintiffs do not point to an approved occupancy permit demonstrating that said application, or any other application, resulted in a determination that the "legal occupancy" of the Property permitted used car sales.

Finally, the IEBC expressly provides that a given use may continue except as "deemed necessary by the code official for the general safety and welfare of the occupants and the public code official." IEBC § 101.4.2. Fenstermacher was therefore authorized to prohibit Plaintiffs' use, whatever it was, from continuing. Plaintiffs' assertion that the Property should be treated as a "building previously occupied" under the IEBC is without merit.

A change of use triggers the requirement that the building be "made to comply with the requirements of this code for such division or group of occupancies," IBC § 3408.1, before

an occupancy permit can be issued.[37] IBC § 3408.2. IBC compliance required the installation of a bathroom. IBC §§ 2901.1, 2902.1. Thus, while Plaintiffs complain that "no work or improvements were planned or requested," (Doc. 89 at 10), "work or improvements" were *required* before Plaintiffs could obtain an occupancy permit, and professionally-drawn construction documents were required to be submitted with their building permit application. Plaintiffs' unsubstantiated beliefs that these improvements were unnecessary do not strengthen their legal position, and do not create any triable dispute of material fact.

Having established that there is no dispute of material fact that CII Defendants properly required Plaintiffs to submit construction documents with their permit application, it is also undisputed that Plaintiffs did not do so, despite having been notified of the requirement several times.[38] Indeed, Plaintiffs do not argue that they were not informed of the requirement. After several discussions with Fenstermacher, they obtained an estimate for the cost to

---

[37] Plaintiffs also challenge CII Defendants' classification of their proposed business as a "motor vehicle showroom." (*See* Doc. 89 at 9.) However, Business Group B occupancies include any "use of a building or structure, or a portion thereof, for office, professional or service-type transactions, including storage of records and accounts." IBC § 304.1. The very nature of the business Plaintiffs intended to open would require the structure on the Property to serve as an office where "service-type transactions" to effectuate the sale of a car are carried out. As such, their proposed business is properly classified as a Business Group B occupancy.

[38] Snelson told Plaintiffs they would need to install a bathroom on the property in order to obtain a Certificate of Occupancy  as early as December 2009. (3/13/20 A. Halchak Dep. Tr. at 93:16–94:13.) Ms. Halchak's notes from a meeting in January 2010 indicate they had been told by a code enforcement officer that they "need to hire a licensed architect to draw up the plans required for a building permit pertaining to accessibility." (*See* K. Halchak 1/19/2010 Meeting Notes, Doc. 65-21, Ex. U at 2.)
 Fenstermacher advised Plaintiffs on March 18, 2014, that in order to obtain a Certificate of Occupancy, they would have to provide accessible bathroom facilities, (Doc. 65 at ¶ 91; 3/13/20 A. Halchak Dep. Tr. at 159:2–11; 3/10/20 K. Fenstermacher Dep. Tr. at 72:8–24, 133:11–16), as well as professional design drawings for those facilities.  (3/13/20 A. Halchak Dep. Tr. at 160:1–9.) He reiterated the need for bathroom facilities to Ms. Halchak on March 25, 2014. (3/10/20 K. Fenstermacher Dep. Tr. at 134:7–19.)

prepare the necessary drawings from an architect, yet declined to engage the services of the architect. (3/13/20 A. Halchak Dep. Tr. at 161:19–162:16.)

With this background, the Court agrees with CII Defendants that Plaintiffs' application is properly characterized as "incomplete," and therefore Plaintiffs were not entitled to a grant or denial of their application. Section 403.42a of the UCC states,

> (a) Applications for a permit required under § 403.42 (relating to permit requirements and exemptions) shall be submitted to the building code official in accordance with this section.

> (b) A permit applicant *shall submit an application to the building code official and attach construction documents, including plans and specifications,* and information concerning special inspection and structural observation programs, . . . and other data required by the building code official with the permit application. The applicant shall submit three sets of documents when the Department conducts the review.

> (c) A licensed architect or licensed professional engineer shall prepare the construction documents under the Architects Licensure Law (63 P. S. §§ 34.1--34.22), or the Engineer, Land Surveyor and Geologist Registration Law (63 P. S. §§ 148--158.2). An unlicensed person may prepare design documents for the remodeling or alteration of a building if there is no compensation and the remodeling or alteration does not relate to additions to the building or changes to the building's structure or means of egress.

> . . .

> (e) The permit applicant shall submit construction documents in a format approved by the building code official. Construction documents shall be clear, indicate the location, nature and extent of the work proposed, and show in detail that the work will conform to the Uniform Construction Code.

34 Pa. Code § 403.42a. Once the application is submitted, the building code official is required to "examine the construction documents and . . . determine whether the construction indicated

and described is in accordance with the [UCC] and other pertinent laws or ordinances," and to "stamp or place a notation on each page of the set of reviewed construction documents" to indicate approval, and "clearly mark any required nondesign changes on the construction documents." *Id.* § 403.43(b), (c).

As these provisions illustrate, the code official's consideration of the permit application and his review of the required construction documents are one and the same—without construction documents, the application is effectively unreviewable. At least one Pennsylvania court has stated that absent a "written application *that conform[s] to the requirements of 34 Pa. Code § 403.42a*, it can be urged that [plaintiff] did not have any appeal rights." *Flanders v. Ford City Borough Council,* 986 A.2d 964, 971 (Pa. Commw. Ct. 2009) (emphasis added).[39] Because Plaintiffs' application did not comply with the requirements of 34 Pa. Code § 403.42a, the Court finds no dispute of material fact that it was incomplete and did not trigger the requirement of a decision under § 403.43. Therefore, Fenstermacher's failure to grant or deny the application did not violate their procedural due process rights.

---

[39] In *Flanders*, the Commonwealth Court of Pennsylvania considered the case of another plaintiff who contested the construction document requirement due to its cost, and in which the Code Administrator advised the plaintiff that his "permit application would not be considered complete until supported by professionally  prepared blueprints." 986 A.2d at 971. The court noted that "[t]he appeal procedures in [the UCC] presume that a permit application has actually been submitted to the building code official." *Id.* The plaintiff had submitted an "at best, an oral application" and had not submitted the required construction documents. *Id.* The court suggested that the plaintiff may not have any appeal rights, but ultimately found he was not denied due process because the code administrator's written directive that he submit blueprints with his permit application was an appealable action under 34 Pa. Code § 403.43(i). *See id.*

Plaintiffs had a procedural path forward: to submit an application with the attachments required under the UCC, after which they would be owed a decision, and subsequently an appeal. But absent a proper application in the first place, Plaintiffs can point to no deprivation of their rights. The Court will grant CII Defendants' Motion with respect to the procedural due process claim. Plaintiffs' motion with respect to CII Defendants is accordingly denied.

### 3. Mandamus Relief

Lastly, CII Defendants have demonstrated they are entitled to judgment as a matter of law with respect to mandamus relief. The Court incorporates here its analysis of Dorrance Defendants' Motion with respect to mandamus. *See supra* at 39–41. Furthermore, CII has established that it is undisputed that CII is no longer the third-party agency authorized to administer and enforce the UCC on behalf of Dorrance Township. Without statutory and contractual duties to act on Dorrance Township's behalf, CII lacks legal authority to administer occupancy permits and has no "corresponding duty" to do as much. *See Orange Stones Co.*, 32 A.3d at 290 ("Mandamus may only be granted where there is a clear legal right in the plaintiff, *a corresponding duty in the defendant*, and a lack of any other appropriate and adequate remedy." (emphasis added)). Fenstermacher has the same defense.

Accordingly, the Court will grant CII Defendants' Motion with respect to mandamus relief, and will grant their Motion in its entirety.

### C. Plaintiffs' Motion for Partial Summary Judgment

As established *supra*, the Court will grant the Motions of Dorrance Defendants and CII Defendants with respect to Plaintiffs' procedural due process claims against them because there are no disputes of material fact and Defendants are thus entitled to summary judgment as a matter of law. This same absence of any dispute of material fact requires that Plaintiffs' Motion for Partial Summary Judgment be denied. Accordingly, the Court denies Plaintiffs' Motion in its entirety.

## V. CONCLUSION

The Court will grant each defendant's Motion for Summary Judgment in its entirety, (Docs. 64, 71), and will deny Plaintiffs' Partial Motion for Summary Judgment in its entirety. (Doc. 66.)[40] A separate order follows.

---

[40] To the extent Plaintiffs sought to assert a separate claim for damages under 42 P.S. § 2503(7), (*see* Doc. 2-1 Counts IV and V), that claim fails as a matter of law and will be dismissed. Section 2503(7) provides that "attorneys' fees may be awarded by the court where the commencement of an action is 'arbitrary, vexatious or in bad faith,' or where a party's conduct during an action is 'dilatory, obdurate or vexatious.'" *Tax Matrix Techs., LLC v. Wegmans Food Markets, Inc.*, 154 F. Supp. 3d 157, 187 n.8 (E.D. Pa. 2016) (quoting 42 P.S. § 2503). It is well-settled that "pre-litigation conduct is not covered by the statute." *Id.* (citing *Cher–Rob, Inc. v. Art Monument Co.*, 406 Pa. Super. 330, 594 A.2d 362, 364 (1991)). Because Plaintiffs have not alleged any bad faith or vexatious conduct on the part of Defendants pertaining to the current litigation, this claim fails.

Plaintiffs' claim under 42 P.S. § 8303 also fails. Section 8303 provides that "[a] person who is adjudged in an action in the nature of mandamus to have failed or refused without lawful justification to perform a duty required by law shall be liable in damages to the person aggrieved by such failure or refusal." As Plaintiffs' mandamus claims fail, so too do their corresponding damages claims.

_s/ Robert D. Mariani_____
Robert D. Mariani
United States District Judge